UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MLIVE MEDIA GROUP, an
unincorporated Division of THE
HERALD PUBLISHING COMPANY,
LLC,

        Plaintiff,

                                    Case No. 14-cv-13148
                                    HON. GERSHWIN A. DRAIN

vs.

KATHRYN WEBBER,

        Defendant.
_____/

**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [#2]
AND FINDING EMERGENCY MOTION FOR ALTERNATE SERVICE [#8] MOOT**

**I.    INTRODUCTION**

On August 14, 2014, MLive Media Group ("MLive"), filed the instant action against its former employee, Kathryn Webber, alleging that Webber misappropriated MLive's trade secrets in violation of the Michigan Uniform Trade Secrets Act, MICH. COMP. LAWS § 445.1901 *et seq*. MLive also asserts claims of tortious interference with business and contractual relationships, common law conversion, statutory conversion in violation of MICH. COMP. LAWS § 600.2919a, breach of fiduciary duty and unjust enrichment.

On August 15, 2014, MLive filed an Emergency Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction. On the same day, the Court entered an Order Granting MLive's Emergency Ex Parte Motion for Temporary Restraining Order and set a hearing on MLive's Motion

-1-

for Preliminary Injunction. Webber filed her Response in Opposition to MLive's Motion for Preliminary Injunction on August 28, 2014, and MLive filed its Reply in Support of Preliminary Injunction on September 2, 2014. A hearing was held on September 4, 2014. For the reasons that follow, the Court will grant MLive's Motion for Preliminary Injunction**.**

## II.      FACTUAL BACKGROUND

MLive is a digital media company that owns numerous local newspapers, as well as owns and operates MLive.com, a web-based news site serving readers and businesses in Michigan. On March 25, 2013, Webber began her employment with MLive as an Account Executive working in MLive's Detroit office, located in Southfield, Michigan. As an Account Executive, Webber was responsible for managing customer relationships, meeting with customers and potential customers to solicit their business, selling customized digital and print advertising campaigns, and training customers and employees on the capabilities and use of MLive's products.

Through her position at MLive, Webber had intimate knowledge of MLive's digital product offerings, product strengths and weaknesses in comparison to competitors' offerings, customer pricing, budgets, and margins, customers' needs, the terms of customer contracts, training for customers, customer contact and personnel information, prospective customer information, marketing strategies, sales plans, sales forecasts, referral-source information, access to valuable reporting and campaign delivery data, and prospective customer pipeline information and plans. Webber claims she was the top revenue producer for MLive.

In order to protect its confidential information, MLive uses password-protected security, retains customer information in a restricted area on the company's secure server, strictly limits such access to certain personnel on a need-to-know basis and now requires Account Executives to execute

non-solicit agreements. MLive also requires its employees to abide by its policies, including but not limited to, policies regarding the confidentiality of information, the distribution of sensitive material, information security, electronic communications, and internet usage. MLive also follows strict protocols when an employee leaves the company in order to protect its confidential information.

On May 7, 2014, Webber received an oral warning for tardiness and on July 3, 2014, she was given a written warning for her continued attendance and punctuality problems. On July 31, 2014, MLive terminated Webber's employment due to her failure to demonstrate improvement with regard to her attendance issues.

Upon Webber's termination from employment, she returned her company issued cellular phone. A review of Webber's phone revealed text messages from Webber in which she claimed to have copied all of her MLive data on her computer to a USB device. Her text messages further show that she copied the material knowing that she would start working at Gannett, one of MLive's largest competitors, on August 18, 2014, and that she planned to shift her clients over to Gannett one by one. Indeed, the day before Webber's termination, she submitted a thirty-day cancellation notice for one of her larger customers.

On August 4, 2014, MLive sent Webber a cease and desist letter, requesting that Webber return MLive's property and allow an inspection of her computer equipment. On August 5, 2014, Webber responded to the cease and desist letter. Webber claimed that she only downloaded personal files and photos. The next day, MLive's counsel contacted Webber again requesting inspection of Webber's personal computer equipment to confirm that she only downloaded personal items. That same day, Webber contacted MLive's counsel stating that she would agree to an inspection of her computer equipment once she returned from her Florida vacation. However, to date, Webber has failed to make any efforts to turn over her computer equipment.

MLive also retained a forensic computer expert to perform an analysis of Webber's work computer. The analysis revealed that Webber downloaded numerous MLive files, including customer related information. The forensic study also uncovered Webber's use of two USB devices with her work computer in July of 2014 and the use of a cloud-based drop-box to store work files. On August 13, 2014, MLive received another cancellation notice from one of its clients that worked with Webber. MLive claims that it will be irreparably harmed if preliminary and permanent injunctive relief is not granted.

### III. LAW & ANALYSIS

#### A. MLive's Motion for Preliminary Injunction

MLive seeks injunctive relief enjoining Webber from continuing to use MLive's trade secrets, as well as non-solicit relief. MLive seeks to preclude Webber from soliciting the customers she worked with while employed at MLive, and the prospective customers about which she gained confidential information during her employment at MLive.

Temporary restraining orders and preliminary injunctions are extraordinary remedies designed to protect the status quo pending final resolution of a lawsuit. *See University of Texas v. Camenisch*, 451 U.S. 390 (1981). Whether to grant such relief is a matter within the discretion of the district court. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007). The same factors are considered in determining whether to grant a request for either a temporary restraining order or a preliminary injunction. *See Sandison v. Michigan High School Athletic Assoc.,* 64 F.3d 1026, 1030 (6th Cir. 1995).

The four factors that must be balanced and considered before the court may issue a temporary restraining order or preliminary injunction include: (1) the likelihood of the plaintiff's success on the merits; (2) whether the plaintiff will suffer irreparable injury without the injunction;

(3) the harm to others which will occur if the injunction is granted; and (4) whether the injunction would serve the public interest. *Certified Restoration*, 511 F.3d at 542; *In re Eagle-Pitcher Industries, Inc.*, 963 F.2d 855, 858 (6th Cir. 1992); and *N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162, 166 (6th Cir. 1989). "None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996). Preliminary injunctive relief "is an extraordinary measure that has been characterized as 'one of the most drastic tools in the arsenal of judicial remedies.'" *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001).

**1. Likelihood of Success on the Merits**

Contrary to Webber's argument, MLive has demonstrated a likelihood of success on the merits of its misappropriation of trade secrets claim. The three elements of an action for misappropriation of trade secrets under Michigan law include: (1) the existence of a trade secret; (2) its acquisition in confidence; and (3) the defendant's unauthorized use of it. *Aerospace America, Inc. v. Abatement Technologies, Inc.,* 738 F. Supp. 1061, 1069 (E.D. Mich. 1990); *see also Henkel Corp. v. Cox*, 386 F. Supp. 2d 898, 903 (E.D. Mich. 2005). "Under Michigan law, a court may enjoin actual or threatened misappropriation of a trade secret and may compel affirmative acts to protect a trade secret." *Henkel Corp.*, 386 F. Supp. 2d at 903.

> Specifically, the Act states:
>
> Actual or threatened misappropriation may be enjoined. Upon application to the court of competent jurisdiction, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.
>
>     \*                     \*                     \*
>
> In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.

MICH. COMP. LAWS § 445.1903(1), (3). The Act defines a trade secret as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

MICH. COMP. LAWS § 445.1902(d). Here, Webber took information from MLive which constitutes trade secrets. The information taken by Webber includes, but is not necessarily limited to: customer, financial, and training material, including a document entitled "key account growth plan." This information derives independent economic value from not being known by the public.

Furthermore, the Court rejects Webber's contention that MLive made "no effort whatsoever to maintain the confidentiality of the customer information and advertising strategies at issue." *See* Dkt. No. 14 at 3. Rather, MLive has taken reasonable steps to protect its information. MLive uses password-protected security; keeps customer information in a restricted area on its company server, and strictly limits access to certain personnel on a need-to-know basis. Additionally, MLive requires its employees to abide by its policies, including but not limited to, policy directives for confidential information and distribution of sensitive material, information security, electronic communications, information and internet usage. *See* Dkt. No. 15, Ex. A.

Lastly, MLive follows specific protocols when an employee leaves the company in order to protect confidential data. Reasonable measures to protect trade secret information include:

> [E]ither an express agreement between the employer and employee restricting or prohibiting disclosure by the latter to third parties; a disclosure by an employer to employee in confidence or with a tacit understanding, inferable from the attendant circumstances, that the information is confidential; or security precautions utilized by the employer to insure that only a limited number of authorized individuals have access to the information.

*Wysong Corp. v. M.I. Indus.*, 412 F. Supp.2d 612, 626 (E.D. Mich. 2005).

Webber argues that the information she downloaded does not constitute "trade secrets" within the meaning of the Act because MLive made no effort to keep the information confidential. Webber relies on the fact that she never signed either a non-compete or a confidentiality agreement. Webber relies on the case of *McKeeson Medical - Surgical, Inc. v. Micro-Bio-Medics*, 266 F. Supp. 2d 590 (E.D. Mich. 2003), wherein the court held:

> In this Court's opinion, customer lists developed by the employee are not protectable 'trade secrets.' To the extent that the list of customers accumulated by the employee includes 'needs of customers' as learned by the employee during the course of his employment, such information is not protectable as a 'trade secret.' It is, however, protectable under an agreement in which the employee agrees not to disclose such information.

*Id.* at 596-97. However, this holding is distinguishable from the facts present here. The customer list at issue in *McKeeson Medical* "was not a list [the employer] kept itself, nor was it compiled from any . . . trade secret source; rather, it was compiled from personal and public sources available to [the defendant]." *Id*. at 594. While this case is similar because there is no non-compete or confidentiality agreement, the information taken by Webber was not compiled from personal and public sources.

Moreover, other courts have enjoined similar conduct without an express non-compete agreement or with an unenforceable non-compete agreement. *See Ackerman v. Kimball*, 652 N.E. 2d 507 (Ind. 1995); *Barilla v. Wright*, No. 4-02-cv-90267, 2002 U.S. Dist. LEXIS 12773 (S.D. Iowa Jul. 5, 2002); *Elm City Cheese Co. v. Federico*, 251 Conn. 59; 752 A.2d 1037 (1999) (barring employee from working in entire industry devoted to the areas where he misappropriated trade secrets despite the absence of a non-compete agreement); *Pepsico, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995).

The Court also concludes that MLive has a likelihood of success on the merits of its tortious interference with contractual and business relationships claim. The elements for this claim are: (1) existence of a business relationship with a third party; (2) defendant's knowledge of the business relationship; (3) intentional and/or improper interference by the defendant that causes a breach,

disruption, or termination of the business relationship; and (4) damage to the plaintiff, whose business relation has been breached, disrupted, or terminated. *Liberty Heating & Cooling, Inc. v. Builders Square, Inc*. 788 F. Supp. 1438, 1447 (E.D. Mich. 1992). Here, Webber has intentionally and improperly interfered with MLive's business relationship with its customers evidenced by the loss of two customers that worked with Webber during her employment with MLive, as well as her text messages, and the forensic analysis of her work computer. This factor favors the issuance of a preliminary injunction.

### 2.  Irreparable Harm

The Court further concludes that MLive has demonstrated it will suffer irreparable harm if preliminary injunctive relief is not granted. To satisfy this prong of the test, a party must demonstrate that unless the injunction is granted, it will suffer "'actual and imminent harm' rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc*., 443 F.3d 540, 552 (6th Cir. 2006). "Loss of customer goodwill and fair competition can support a finding of irreparable harm. Such losses often amount to irreparable injury because the resulting damages are difficult to calculate." *Superior Consulting Co. v. Walling,* 851 F. Supp. 839, 847 (E.D. Mich. 1994) (concluding that the use of confidential information concerning the "specific needs and service provided to the plaintiff's clients" would enable the defendant "effectively to solicit [the plaintiff's] clients, and to undercut [the plaintiff]'s rates while providing the same services provided by [the plaintiff]."). Webber offers no argument concerning irreparable harm. Based on the foregoing considerations, the Court concludes that MLive has demonstrated irreparable harm. This factor also supports the issuance of preliminary injunctive relief.

### 3.  Harm to Others

MLive argues that the harm it will suffer outweighs the harm to Webber if preliminary injunctive relief is not granted. Webber likewise offers no argument on this factor.  MLive maintains that Webber will not be harmed if she is enjoined from soliciting her prior and prospective customers because she may still work for Gannett. MLive's loss of customer goodwill and its trade secrets greatly outweighs any harm to Webber if the preliminary injunction is granted. As such, the Court concludes that without preliminary injunctive relief, Webber will continue to raid MLive's customers by using its confidential, proprietary, and trade secret information.  This factor likewise favors granting preliminary injunctive relief.

### 4.  Public Interest

Lastly, MLive argues that the public interest supports the issuance of a preliminary injunction because of the public's interest in protecting businesses' confidential and trade-secret information. Webber fails to address this factor in her Response. The Court concludes that this factor also favors the issuance of a preliminary injunction.

### B.    MLive 's Emergency Motion for Alternate Service

On August 20, 2014, MLive  filed an Emergency Motion for Alternate Service.  In its Motion, MLive argues that Webber has avoided service of the pleadings and Temporary Restraining Order and requests that the Court deem service via email on Webber proper, or alternatively, permitting MLive to serve Webber at her home by leaving the Court filings in a sealed envelope in her door or mailbox. On August 22, 2014, counsel for Webber sent correspondence to the Court and opposing counsel indicating that his office will accept service on behalf of Webber.  A review of the docket in this matter demonstrates that the Certificate of Service was returned executed on August 22, 2014.  As such, Plaintiff's Emergency Motion for Alternate Service is moot.

## IV.   CONCLUSION

All four factors this Court must consider when determining the propriety of preliminary injunctive relief favor issuance of a preliminary injunction.  Plaintiff's Motion for Preliminary Injunction [#2] is therefore GRANTED.  The Court will enter a  separate Preliminary Injunction Order.  Plaintiff's Emergency Motion for Alternate Service [#8] is MOOT.

SO ORDERED.

Dated: September 4, 2014			/s/Gershwin A Drain
						GERSHWIN A. DRAIN
						UNITED STATES DISTRICT JUDGE